SPRING 1811.
First District.

RAMOZAY
& AL.
vs.
THE MAYOR
&c. OF N. OR-
LEANS.

JUDGMENT FOR THE PLAINTIFFS.

## RAMOZAY & AL. vs. THE MAYOR &c. OF NEW-ORLEANS.

CONDICTIO INDEBITI. The plaintiffs were keepers of grog-shops, and for several years past, had paid the sum of one hundred dollars each, into the treasury of the city, for a license to retail liquors by the small measure, keep a billiard table and a boarding-house or tavern. By consent of the defendants, they joined in a suit, to recover back the greatest part of the money thus paid, on the ground that this general license had been forced upon them, the officers of the Mayoralty, having made it a rule not to grant licenses for retailing liquors only, and to grant only licenses for the cumulated objects of retailing liquors, keeping a billiard table, and an hotel, tavern or boarding-house.

Whether the Corporation may cumulate licenses for retailing liquors, billiard-tables and boarding-houses?

THE above rule was admitted by the defen-

Hh

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

dants' counsel, to have been that which governed the conduct of the officers of the Mayoralty, but there was no evidence that any of the defendants had made application for a license, for the sole object of retailing liquors. Their licenses were not produced, nor evidence given of the contents of any of them in particular, but the books of the mayoralty, which were produced by consent, shewed that the defendants were entered as holders of a license for the three objects.

*Livingston* for the plaintiffs. The defendants contend that they have a right to receive this sum

1. By the powers vested in them by the charter of 1805 :

2. By those conferred on the cabildo, under the Spanish government and confirmed by the charter of 1805.

I. What are the original powers conferred by the charter of 1805, as applicable to this subject ?

"COUNCIL shall have powers to pass bye-laws, " for the better government of the affairs of the " corporation, for regulating the police and pre- " serving the peace and good order of the city : " provided that no such bye-law be contrary to " the *charter*, to the *constitution of the U. S.* or " the *laws of the Territory.*—They shall have " power to raise by tax, in such manner as they " shall deem proper, upon the *real* and *personal*

" *estate,* within the said city, such sum as may
" be necessary for lighting, paving, &c.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

" Provided that the said Mayor, &c. shall not
" have power to regulate the price of any other
" provisions than bread, or the price of mer-
" chandize brought or imported into the said
" city.—Nor to tax *butchers* or *bakers,* nor *carts*
" nor *drays,* otherwise than for the licenses
" herein after provided for.

"The Mayor shall licence all taverns and board-
" ing-houses, hackney coaches, carts and drays,
" *subject to such restrictions,* as the Mayor and
" City Council shall *by ordinance* direct. And
" the Mayor shall be entitled to receive for every
" license, the sum of two dollars and an half."
*Act of February* 17, 1805, *ch.* 12. *sec.* 6 *and* 11.

THIS charter, like all other statutes in dero-
gation of general law, erecting new jurisdictions
and vesting new powers, ought to be *strictly*
construed.

THIS power, to wit : that of taxing, being one
of the attributes of sovereignty, shall not be pre-
sumed to be granted, but by express words and
shall never be enlarged by construction—Thus
in the present instance, a power is given to *tax,*
but it shall be strictly confined to the objects
expressly designated, viz : *real* and *personal es-
tate.* A power is given to take two dollars and an
half, for a license ; it shall not go beyond that
sum.

SPRING 1811.
First District

RAMOZAY
&c. AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

THE council are authorised to make " bye-" laws, for the better government of the affairs " of the corporation, for *regulating the police* and " *preserving peace* and *good order.*" Their bye-laws must have no other objects, nor will these general expressions authorise an imposition *ad libitum* on taverns or any other profession or calling, more especially as the means of obtaining a revenue to carry these objects into effect, are pointed out in the charter by *tax* on *real* and *personal estate.*

THE expression used in the clause giving power to the Mayor to license, "subject to *such* " *restrictions* as the Mayor and city council, shall " *by ordinance* direct," evidently relates to the restriction of number, to the rules which may be made, for regulating the conduct of innkeepers as to the time their houses shall be kept open, the security they shall give, the duration of their licenses, and other objects of the like nature. But in this case, it cannot by any reasoning, be made to apply, as the only *ordinance* produced is one made within the last of the four years, for which we claim a return of the imposition.

THE only remaining argument is drawn from the *proviso*, that the Mayor &c. shall not have power to regulate the price of merchandize, provisions, &c. nor to tax *butchers* or *bakers*, nor *carts* nor *drays*, otherwise than for the licenses therein provided for. The taverns, it is said, are omitted here, and therefore, there is a right to

tax them. This is strange reasoning and would go to permit an indefinite tax on any particular calling, profession or trade, except *butchers*, *bakers*, *carts* and *drays*. Physicians, merchants, shop-keepers, lawyers, tradesmen of every description, are made liable to an arbitrary tax, and the whole expences of the city may be thrown on one description of citizens ( retail shop-keepers for instance ) who may not happen to have a proper interest in the city council. This is certainly a power which shall not be supported by implication, nor without the most express grant.

It is also worthy of remark that the charter gives a power to make such bye-laws only, as shall not be contrary to the *Constitution of the U. S.* If this means any thing, it must mean that the bye-laws shall not be contrary to the regulations of the Constitution of the U. S. in *pari materia :* otherwise, it is difficult to conceive how the bye-laws of a corporation can be contrary to the Constitution of the U. S. If this be the case, then the power contented for, would be forbidden by the section which declares that all duties, impositions and excise, shall be equal.

This first point has not been strongly urged, and I think we may safely say, that there is nothing in the law of 1805, incorporating the city, which vests in the defendants, the right of exacting an arbitrary sum, from any particular profession or trade. I think it goes further and, by

Spring 1811.
First District.

Ramozay & al.
vs.
The Mayor &c. of N. Orleans.

SPRING 1811.
First District.

RAMOZAY & AL.
vs.
THE MAYOR &c. OF N. ORLEANS.

designating a sum to be paid for a license, excludes all other impositions. It has been said that this sum is only a perquisite of the Mayor, and therefore, not a tax. It is a perquisite, but not less a tax; the application is indifferent to the person who pays, whether it goes into the pocket of the Mayor or the coffers of the corporation, makes no difference to him.

II. If the city then have no original power given them by the act of incorporation to lay this tax, can they derive it from any former powers of the cabildo, confirmed to them by that act?

THE 13th section enacts "that all the estates, "whether real or personal, the rights, dues, debts, "claims, or property whatsoever, which here-"tofore belonged to the city of New-Orleans, "or was held for its use by the cabildo, under "the Spanish government, the municipality, af-"ter the transfer of the province, in the year "1803 to France, or the municipality now ex-"isting, which has not been legally *alienated* or "*lost* or *barred*, shall be vested in the said Mayor, "&c. to be enjoyed, received, collected and sued "by them and their successors forever."

HERE, three enquiries present themselves:

1. Whether this power of taxing inns and taverns, supposing it to have been legally exercised by the cabildo, is by this section vested in the Mayor, aldermen and inhabitants of the city of New-Orleans.

Spring 1811.
First District.

Remozay
& al.
vs.
The Mayor
&c. of N. Or-
leans.

2. Whether it was ever vested in the cabildo, and to what extent.

3. Whether, if it were *vested* in the cabildo, it was not *lost*, prior to the act of 1805.

I. The words are *rights, dues, debts, claims, or property whatsoever.* What is the thing contended for ? A *power* to tax a particular description of persons—will this be given by the expression *rights*, which is the one selected as conveying it ? It may, I think, very reasonably be doubted, more particularly as this term may be fully satisfied without recurring to the broad exposition which is contended for, as there are among the objects secured to them, certain rights strictly so called, such as a right to a perpetual rent, &c. The observations before made, as to a strict construction of this kind of grants, will here forcibly apply. Suppose the cabildo had formerly the power of laying all kinds of taxes in the most unlimited manner ; and this charter had no other clause on that subject, than the one now under discussion—would these general words have revived the right of taxation ? It is believed they could not. This is certainly a *political power,* and I think the true construction of the clause in question, is that it transfers from the cabildo to the corporation, only *private rights :* an opinion which, I believe, will be strenghtened by a consideration of the context. " All the estates " and rights, dues, debts, claims, or property " whatsoever, which, heretofore, *belonged* to the

SPRING 1811.
First District.

RAMOZAY & AL.
vs.
THE MAYOR &c OF N. ORLEANS.

" city of New-Orleans, or was held for its use." Now the terms " *belonged* " *and held for its use*" evidently apply to *private property*, not the *power of taxation.*—

BUT, if these words should be deemed sufficiently operative to vest the power, they can give no more that was legally exercised by the cabildo, and not even that, if it shall appear to ha e been *lost*, at any time before the incorporation.—

II. We must enquire then, whether this power was ever legally vested in the cabildo—to what extent, and whether it has not (if it ever existed) been lost by the events which took place prior to the passage of the incorporating law.—

To prove this power legally vested in the cabildo, an ordinance is produced promulgated by O'Reilly in 1770, in which he says, that pursuant to the *spirit* of the 1*st law of the* 13*th tit.* 4*th Book of the laws of the Indies*, he should proceed to assign to the city of New-Orleans, the corporate property *(proprios)* necessary for the city expences. That therefore, untill his majesty should pronounce thereon, he had assigned, *inter alia*, 40 dollars, which each of *the* 12 *taverns, (tabernas) which are permitted* in the city are to pay annually.—Also, other 40 dollars, which, each of the six billiard-tables, are to pay annually; other 40 dollars, to be paid annually by the house in which lemonade and other refreshments are sold, and 20 dollars, which are

annually to be paid by each of the six inns or
eating houses *(posadas.)*

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. of N. OR-
LEANS.

Now by referring to the law, the spirit of
which Mr. O'Reilly thinks will warrant his trans-
ferring this power, it will be found that neither
the letter nor the spirit, will bear this construc-
tion. The law reads as follows : " The vice-roys
" and governors who have the power, shall de-
" signate to every town and place, which shall
" be *newly founded* and *settled* the *lands* and *lots*
" *(tierras y solares)* which may be necessary,
" and which may be given without prejudice to a
" third person or corporate property *(proprios)*
" and shall send us an account of what shall
" have been designated and given to each one, in
" order that we may *order it to be confirmed.*"
This law was applicable only to *newly founded*
*cities ;* the spirit, however, might without a forced
construction extend it to a city acquired by con-
quest or cession : but, neither the letter nor the
spirit, could ever authorise the transfer in favor
of a city of the right of taxing. The words are
explicit, shall designate lands and lots, and those
only on condition of their being confirmed.
There is also, a positive prohibition on this sub-
ject, contained in the 1*st. law,* 15 *tit.* 4 *Lib. of*
*the law of the Indies.* " We ordain that no com-
" munity, nor individual of whatever state, dig-
" nity or condition he may be, shall impose any
" *excise, duty or contribution,* without our special

I ı

SPRING 1811.
First District.

RAMOZAY
& AL.
vs.
THE MAYOR
&c. OF N. OR-
LEANS.

" license, unless it be in the cases permitted by " law and the laws of this book, and we revoke " and hold for null those which shall be intro- " duced in any other manner." Here then, it appears that the law which the governor cited as his authority for vesting the cabildo, did not give it him, and that he was moreover expressly forbidden by another law, from exercising it. If he had not cited his authority, the court might, perhaps, have presumed that it was duly exercised, but since he has done so, they are bound to examine it.—If the grant, therefore, was made by an officer who had no power to make it, nothing passed by his grant, no power was legally vested in the cabildo, and of course, nothing was transferred to the corporation of New-Orleans, by the territorial act.

BUT if he had the power, the grant was made subject to the confirmation of the king, and that confirmation has never been obtained : it is, therefore, void. See the words of the act I have quoted, the governor " shall send an account of what shall have been designated *that we may order it to be confirmed*"—O'Reilly's ordinance too contains the same claim.

BUT, if this power was legally vested in the cabildo, what was the extent of that power? Clearly, I think, no greater than is warranted by the words of O'Reilly's grant, that is, 40 dollars on *twelve* taverns, *six* billiard-tables, *one* coffee-house ; and 20 dollars on *six* eating houses.

There is no *reason of policy*, or *probable intent* of the grantor, that will authorise an *enlarging construction*. All these are for narrowing it.

1. *Policy.* It is certainly contrary to every rule of public policy, that a temptation should be held out to intemperance and gaming by multiplying the opportunities for indulgence in them. Such would, undoubtedly, be the effect of suffering the same persons, who draw a re-venue from these sources, to encrease the numb-er. Public policy too, would, I think, be for a *narrowing*, rather then an *enlarging* construc-tion of a grant, that trenched even in its strictest construction on so important an attribute of so-vereignty as the right of taxation,

2. *Probable intent of the legislator.* This is referred to, by the best writers as the surest test of the true meaning of an act. It is to be gathered first, from the words " *the twelve taverns,* that are permitted in this city." Here pains seem to have been taken, and certainly several words em-ployed which would have been useless, if the construction contented for was the true one. Why speak of the number at all ? Why recite that that number was permitted ? But to restrain— when a single word would have given the en-larged construction. Forty dollars on *all the ta-verns* which shall be kept" would have been the natural and obvious expression : if the en-larged construction had been the true intent, and the restrictive expressions shew, as strongly as it

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

SPRING 1811.
First District.

RAMOZAY
&C. AL.
*vs.*
THE MAYOR
&C. OF N. OR-
LEANS.

is possible for words to do, the limited nature of the power—if too the inconveniences which I have pointed out, under the head of public policy, would result, it is not reasonable to suppose that it was the intent of the legislator to permit them.

IF, therefore, the grant be valid and vested any right in the cabildo, it was only for the objects specified in the ordinance, and cannot be extended beyond them.—Should I, however, be again mistaken in my reasoning, and should the court think the cabildo was not by the ordinance confined to the specified number, yet they had no right to exact any thing beyond the forty dollars per annum, imposed by that grant upon taverns. Here again, we must recur to the probable intent of the act, and from the words of the instrument, as well as the nature of the thing, there is every reason to believe, that the intent was to keep the several licenses separate, and they were kept so during the whole of the Spanish government here, except in a single instance, that of billiard-tables being kept in *boarding-houses, (posadas)* not taverns *(tabernas.)* Where they were joined in this manner, the two taxes or *sixty* dollars were paid, and this is the highest sum ever received before the year 1805, and that only in cases where the parties applied specially for the two licenses to keep a billiard-table and a boarding house.

Now it is attempted to make another stride,

and not only cumulate the whole of the taxes on an individual desiring the several licenses, but, to impose the taxes of all three on an individual desiring only one—the clerk of the Mayor tells us that no individual, desiring a license to retail liquor, can get any other than one for which he must pay 100 dollars, and which in the opinion of the witness, gives a right to keep an *inn*, a *boarding-house* a *coffee-house*, and a *billiard-table*, but which from an inspection of the license as filled up, gives no such right. It is simply to keep a *tavern*. It is true there is also a clause, that if in addition to the tavern *he keeps* a boarding house, he must comply with the regulations of the police on that subject. This however gives no license for keeping a boarding-house, nor would it be a defence in a suit brought for the penalty ( if there be any ) for keeping one. But even if it should give these, and even other rights ; it is surely an imposition to make a man pay for that which he does not want : before you will give him that which he does, and the Mayor might just as well refuse to give a license to an hackney coach-man, unless he would also take and pay for a marshall's warrant, the commission of scavenger and the liberty of keeping a billiard-table, tavern and eating house in his coach.

It was admitted on the first hearing and will appear by the books of the corporation that the licenses of the plaintiffs were simply *tavern licenses* and that they paid for each of them one

Spring 1811.
First District.

Ramozay
& al.
vs.
The Mayor
&c. of N. Or-
leans.

SPRING 1811. hundred dollars per annum. So that they are
First District.
at any rate intitled to a return of 60 dollars per
RAMOZAY annum, illegally exacted, if the powers of the
& AL.
*vs.* cabildo are vested in the corporation and those
THE MAYOR powers were legal. But I contend further
&c. OF N. OR-
LEANS.

 3. That the power of taxing taverns, even if
it were vested in the cabildo, has not been trans-
ferred to the corporation, because it comes with-
in the exception, in the latter part of the clause.
It is one of those rights, if it be one, which are
*lost* or *barred.*

 THE power of taxing is a political one. It is
an essential part of the *sovereignty* of a nation.
However they may delegate it for particular pur-
poses, that delegation can last no longer than
while that government retains the sovereignty.
When that sovereignty is lost, either by cession
or conquest, it goes unincunbered into the hands
of the acquiring power, unless there be some
special reservation. Now, here the only reser-
vation in the treaty, is that the inhabitants shall
be preserved in the enjoyment of their *liberty,*
*property* and *religion :* nothing even by *implica-*
*tion* in favor of this delegation of sovereign pow-
er, therefore, as the whole sovereignty was ceded
first to France and afterwards to the United Sta-
tes, they must take it unincumbered. The power
( or right, if they prefer so to call it ) of laying
this imposition is one of those which were *lost* by
the political operation of the double transfer and

is, therefore, one of those expressly excepted by the act of incorporation, even if it be proved that it was legally vested in the cabildo. And the corporation might as well now pretend to the nomination of the *judges*, because the cabildo had the right of electing the *Alcaldes*, as they can now pretend to lay a tax on the taverns, because the cabildo had that right. The right of appointing to office is not more inseparable from sovereignty, than the right of laying a tax : neither can be exercised without the express delegation of the sovereign *de facto*. And both have therefore been *lost* by the transfer of dominion and, of course, are not included in the act.

I have endeavoured to shew

I. That, neither by the words nor the spirit of the act incorporating the city, any *general power* of taxing taverns or other objects specifically is given.

AND that in this instance, it is particularly restrained to the sum designated to be paid for the license.

II. That this power is not given by the reference in the 13th section, to the rights vested in the cabildo.

1. Because, the words of the act of incorporation, are not sufficiently operative to vest these powers.

2. Because, the cabildo itself never rightfully held them. The governor having no power to grant, and his grant wanting confirmation.

SPRING 1811.
First District.

REMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

Spring 1811.
First District.

Ramozay
& al.
vs.
The Mayor
&c. of N. Or-
leans.

3. Because, if the cabildo ever had such a power it was limited to only twelve taverns and at any rate only to the exaction of 40, not 100 dollars.

4. Because, this power is one that comes within the exception of those rights, &c. which had been before the passage of the law *barred* or *lost*.

There remains only one objection to our right of action. It is said that this sum has been voluntarily paid, and that *volenti not fit injuria*.— There are two answers to this objection, one is contained in the authority used to support it. *Evans' essay on money had &c.* says, that this objection can not avail where the money has been taken to permit the enjoyment of a natural right. Now every man has a natural right to pursue such profession as he pleases, provided it be not immoral or immediately injurious. If therefore, any person claiming a power to restrain this right, shall exact money for it, and it afterwards appears he has no such power, the money may be recovered back. Now tho' the corporation have a right to restrict the number of inns, yet they have not yet done it. And the trade is, therefore, *free to all.*

The other answer is, that whenever money has been paid, by one party *bona fide* to another who innocently or designedly mistakes his powers, it is subject to repetition.

It was suggested from the bench, that if the right to tax taverns was limited to twelve, that

then all the others acted illegally in procuring their licenses, and as *participes criminis*, cannot recover the money they have paid. But, there can be no *particeps criminis*, unless there be a corrupt or *criminal intent*, which is not suggested against the plaintiffs. And as strong an answer is, that altho' the cabildo should be limited to recover the tax upon only twelve taverns, yet, it by no means follows that all the others are illegal. They will not become so, untill some law has been passed, restricting the number, which has not appeared.

*Moreau* and *Duncan* for the defendants. We are not unwilling to admit, with the plaintiffs' counsel, that the charter of the city of New-Orleans, like all other statutes made in derogation of the general law, ought to be construed *strictly:* but we cannot join him in his assertion, that the power of taxing, being one of the attributes of the sovereignty, is not to be presumed to be granted, but by *express words*. For, in the case of *Blanc & al.* vs. *the Mayor &c. ante* 125, the court said, that corporations, the charters of which are silent as to the right of laying taxes, must have that right, as an incident to their incorporation : that it rises *ex necessitat rei*, and as the government of a city, cannot be supported without money, and as money cannot be raised without taxes, the authority to govern necessarily draws with itself that of laying taxes.

Kk

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

THE corporation is very far from raising its pretentions to the right of laying any indefinite tax on any calling or profession, or to lay any tax on any profession, which is not specially and expressly liable to taxation, under their charter.

IT is under the 13th section of their act of incorporation, cited by the plaintiffs' counsel, *ante* 246, that the defendants conceive they are authorised to retain the money which the plaintiffs have paid them, for their respective licenses to sell liquors, keep a billiard-table and boarding-house.

THAT section vests in the defendants all the rights which heretofore belonged to the city of New Orleans, and our adversaries have shown, that in the year 1770, the city was endowed with the right of receiving 40 dollars, for each tavern and billiard-table, and 20 dollars, for each of the boarding-houses which were then established and allowed, within the city. In this clause, the tax has appeared to them fixed and definite, and the keepers of taverns, billiard-tables and boarding-houses, expressly pointed out, as the persons from whom it might be exacted.

IT is thought useless to inquire whether O'Reilly exceeded his powers, and wrongfully construed the Spanish law, under which he assigned the *proprios* of the city. It suffices for us that he made the assignment, and that the right assigned was held by the city, under his

grant, as long as the country remained under the dominion of Spain. The act of incorporation vests in the Mayor &c. *all the rights........ which heretofore belonged to the city of New-Orleans.* The right of receiving the tax, belonged, at least *de facto*, and we contend *de jure*, to the city. It was therefore granted by the charter.

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

THE *right of taxing* is not claimed : but only that of receiving a tax already imposed. So that the law of the Indies, cited by the plaintiffs, was not violated.

O'REILLY's assignment, of the *proprios*, is expressly made, till *the king's pleasure shall be known.* It had, therefore, an immediate effect, which might be suspended or destroyed by a contrary declaration of the royal will. The king's confirmation was not essential to its validity, it perhaps would have had no other effect, than to strengthen the assignment, so as to take it out of the governor's power to make any alteration, which, till after the royal confirmation, he perhaps might do. *Eodem modo quo quid construitur, eadem modo destruitur.*

BUT, it is contended that the assignment did not authorise the city, to collect any money from a greater number of taverns, billiard-tables and boarding-houses, than that mentioned by O'Reilly. Policy seems to require, it is said, that the temptation to intemperance and gaming, should not be encreased, by multiplying the opportunities of indulgence; which would be the effect

SPRING 1811.
First District.

RAMOZAY
&c. AL.
*vs.*
THE MAYOR
&c. OF N. OR-
LEANS.

of suffering the persons who draw a revenue from these sources, to increase the number.

TAVERNS, billiard-tables and boarding-houses, were licensed under the Spanish government, by the governor : so that the officers of the city, who drew a revenue from them, could be under no temptation improperly to increase it ; for they were without the power.

As the population of the city increased, new houses were licensed, and as the wants of the city kept pace naturally with the increase of its inhabitants, it was in the order of things, that the sources of its supplies, should also be multiplied. It would have been hard, when the number of these houses was doubled, that a half of them alone should be mulcted.

O'REILLY subjected *all* the taverns, billiard-tables and boarding-houses, at the time in the city, to the tax : and when new ones arose, it was right for the city to say, they should pay also. *Ubi eadem est ratio, eadem est lex.*

THIS, no doubt, is the construction that we would give to the assignment, if we were not furnished with complete evidence, that it was the one which prevailed as long as the Spaniards had possession of the country. This appears from the return of Don Juan de Castanedo, *ma-yordomo de proprios* of the city, a short time before the cession : from which it appears that there were then sixty two keepers of *tabernas* in the

city, paying the 40 dollar tax each : ten keep-
ers of *posadas* and billiard-tables, paying 60 dol-
lars each : eight keepers of billiard-tables, paying RAMOZAY
& AL.
vs.
THE MAYOR
&c. OF N. OR-
LEANS.
40 dollars each and eight keepers of *posadas*
paying 20 dollars each. The assignment was
then, therefore, construed to extend to all taverns
&c. existing at the time of the collection. *Opti-
ma est cotemporanea expositio.*

IT is next contended, that the corporation has
no right to cumulate the permissions of keeping
a tavern, billiard-table and boarding-house.

THE return of the *mayordomo* is evidence
that such a cumulation prevailed in the case of
boarding-houses and billiard-tables. In addition
there is a resolve of the cabildo, on the represen-
tation of the *mayordomo*, authorising the cumula-
tion of these several taxes, on a license for the
several objects.

AN ordinance of the municipality during
the short time, that the province of Louisiana
was in the possession of the French, fixes the
tax on taverns, *cabarets* or grog-shops, at 60
dollars per annum.

AND an ordinance of governor Claiborne, of
the 25th of February, 1805, while he exercised
the functions of governor-general and intendant,
authorises the municipality to give licenses to
keep coffee-houses, inns, billiard-tables and grog-
shops, and appropriates the tax imposed on each
of said licenses, to the use of the city.

SPRING 1811.
First District.

RAMOZAY & AL.
*vs.*
THE MAYOR &c. OF N. OR- LEANS.

So that the right, not of taxing, but of receiving taxes imposed on, taverns, billiard-tables and boarding-houses, belonged to the city of N. Orleans, at the time it received its present charter and was therefore confirmed by it, unless it can be shewn that it *has been legally alienated, lost or barred.*

The plaintiffs' counsel contends, that the power of taxing is a political one, an essential part of the sovereignty, which must, by the cession have passed to the United States. There is certainly a difference between the power of taxing and the right of receiving the produce of a tax, already imposed. This right the city never lost, for they exercised it without interruption, under the Spanish, French and American governments, till it was confirmed by the charter and have ever since continued to enjoy it under that instrument.

MARTIN *J.* The city having enjoyed the right of receiving a tax on billiard-tables, taverns and boarding-houses, during a period of upwards of forty years, the whole time that it was under the dominion of Spain, that right would be considered as one of those to which the legislature made a reference by the words, *rights....which heretofore belonged to the city*, even if it were clearly proved, that O'Reilly had exceeded his authority.

THE number of taverns &c. which existed at the time of the assignment, appears to me to

have been inserted, to describe rather than to limit, the objects of taxation.    The reason of the thing, and the cotemporaneous construction of the officers of Spain, lead to this conclusion.  The act of 1806 ch. 10, which lays an imposition on taverns *without the city*, impliedly recognises the liability of those within, to a tax for the benefit of the city.    I feel no difficulty, therefore in saying that the city may exact the tax from every tavern, billiard-table and boarding-house.

WHETHER they may cumulate two or the three taxes in one license, is a question which must surely be answered in the affirmative, in every case in which the applicant for a license desires it for the cumulated objects.  As it appears from the books of the mayoralty, which have by consent been read in evidence, that a license authorising the plaintiffs respectively, to keep a tavern, billiard-table and boarding-house, was received and paid for, by each of them, and there is no proof of an application for a limited license, the court cannot presume, that the plaintiffs were not satisfied therewith.  They have enjoyed the faculty for which they have paid.

I am, however, not ready positively to say that, if it were in proof, that one of the plaintiffs had made application for a license to sell liquors, keep tavern, *taberna*, and expressed his unwillingness to receive one, authorising the keeping of a billiard-table, &c. and on the refusal of the

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&C. OF N. OR-
LEANS.

SPRING 1811.
First District.

RAMOZAY
& AL.
*vs.*
THE MAYOR
&C. OF N. OR-
LEANS.

officers of the Mayor, had yielded to the neces-sity and taken a license and paid for the cumu-lated objects, he could have been relieved. For, it would have, perhaps, been his duty to apply to the city council, who might have considered his application, and given orders to accomodate him.

NEITHER is it very clear, that this cumu-lation is an extortion. No one has an absolute right to demand a license. The city council might from reasons of policy confine to boarding-houses, the sale of liquors and the keeping of billiard-tables. By confining to a small numb-er, establishments which have a tendency to promote noise and disorder, the vigilance of the officers may be more successfully employed.

It is true, the passing such ordinance might be attributed to motives of avarice. But impro-per views will not be presumed in a body of ma-gistrates, while correct ones naturally present themselves. Whether it would increase the re-venues of the city, is a problematical question. Many who willingly would take a license for any one of these objects, would abstain from it, if it could not be obtained without being joined to the others.

LEWIS *J.* Neither of the plaintiffs is entitled to relief, unless he shew that his application was for a single license. If he took one for the cumu-lated objects, on the presumption that a single

one could, by no means, be obtained, he must
fail in his application to be reimbursed, because
he has neglected to provide the evidence of the
injustice, which he contends has been done to
him.

I cannot join, however, in the opinion that
the city council may lawfully withhold a license
for one of the three enumerated objects, with a
view to raise the tax on it, by compelling the
applicant to take one for the other two also.

CUR. ADVIS. VULT.